**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal Case No. 16-00088 (CKK) |
| | ) |
| DAVID BERNIER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

---

## MEMORANDUM OPINION
### (August 23, 2018)

A Hearing on Violation of Defendant David Bernier's supervised release was held on June 7, 2018. *See* Transcript of June 7, 2018 Hearing on Violation of Supervised Release ("Tr.") Upon consideration of the three Petitions by the United States Probation Office dated March 23, 2018[1], ECF No. 42; April 17, 2018, ECF No. 49; and June 2, 2018, ECF No. 55, the testimony presented and representations made at the Hearing on Violation, the Court's observation of the witnesses' demeanor, and the entire record in this case, the Court finds by a preponderance of the evidence that Defendant David Bernier has violated the conditions of his supervised release, and accordingly, his supervision shall be revoked. A separate Order accompanies this Memorandum Opinion.

## BACKGROUND

On June 20, 2016, Defendant David Bernier ("Defendant" or "Mr. Bernier") pled guilty to a one count Information, charging Mr. Bernier with Making False Statements in violation of 18 U.S.C. § 1001. *See* Plea Agrmt. at 1-2, ECF No. 6 (wherein Defendant agreed that "the "Statement

---

[1] The Probation Petition docketed on March 26, 2018, at ECF 42, is erroneously dated March 23, 2017, instead of March 23, 2018.

of Offense" fairly and accurately describe[d] [his] actions and involvement in the offense to which [he] [was] pleading guilty.") As described in the Statement of Offense, Mr. Bernier forged documents regarding his military service, with the use of a computer, in connection with his claim for compensation he was not entitled to from the National Mortgage Settlement, and he made false statements about these documents and his military service to a Special Agent with the United States Department of Justice Office of the Inspector General. *See* Statement of Offense, ECF No. 5, at 4-6.

Pursuant to the advisory U.S. Sentencing Guidelines, Mr. Bernier's criminal history category was I and his total offense level was 17. As such, the advisory guideline range for his offense was a term of 24 to 30 months imprisonment. However, the Court applied a variance/departure and, on January 6, 2017, the Court sentenced Defendant to a six month period of incarceration followed by supervised release for a period of twenty-four months. Judg. in a Crim. Case, ECF No. 30, at 2-3. In addition to the required mandatory conditions of supervised release, the trial court set special conditions requiring Mr. Bernier to "contribute 100 hours of community service" and "participate in a mental health treatment program, which may include outpatient counseling or residential placement, as approved and directed by the Probation Office." *Id.* at 5.

Before Mr. Bernier's supervised release commenced on August 4, 2017, and while he was still incarcerated, the United States Probation Office for the District of Columbia ("D.C. Probation Office") filed a Petition requesting that the conditions of his supervision be modified to add the following condition:

Computer and Internet Monitoring – Defendant shall participate and comply with the requirements of the Computer and Internet Monitoring Program (which may include partial or full restriction of computer(s), internet/intranet, and/or internet-capable devices), and

shall pay for services, directly to the monitoring company. The defendant shall submit to periodic or random unannounced searches of his/her computer(s), storage media, and/or other electronic or internet-capable device(s) performed by the probation officer. This may include the retrieval and copying of any prohibited data. Or, if warranted, the removal of such system(s) for the purpose of conducting a more comprehensive search.

June 21, 2017 Prob. Pet., ECF No. 35, at 1. The D.C. Probation Office indicated that Mr. Bernier had requested release to the District of Maine for supervision, and the United States Probation Office for the District of Maine ("Maine Probation Office") had "conditionally approved accepting his case for supervision pending the approval of the proposed modification." *Id.* at 2. The D.C. Probation Office informed the Court that Mr. Bernier was "in agreement [with] the modification" as evidenced by the fact that he "signed the attached *Waiver of Hearing to Modify Conditions of Supervised Release* ("Waiver")." *Id.*

The Court concurred with the recommendation of the D.C. Probation Office to include the aforementioned condition of supervision regarding Computer and Internet Monitoring based on the facts underlying Defendant's charge of Making False Statements and his misuse of a computer to create false documents. *See* June 23, 2017 Order, ECF No. 36. Despite having signed a Waiver, Defendant challenged the imposition of the Computer and Internet Monitoring condition on grounds that such condition was "not reasonably related to the offense for which he was convicted." Defendant's Opposition to Modification of Conditions of Post-Sentence Supervision ("Opposition"), ECF No. 38, at 2. While "Defendant acknowledge[d] that he consented to a supervisory restriction during his period of incarceration" he indicated that it was because he "did not consult with counsel" and he was "under the mistaken belief that signing the agreement was a condition precedent to the State of Maine accepting transfer" of his supervision. *Id.* at 4.

The Waiver that Defendant signed stated that he "voluntarily waiv[ed] [his] statutory right to a hearing and to assistance of counsel" and further, that he "agree[d] to the [ ] modification of

[his] Conditions of . . . Supervised Release" by accepting the Computer and Internet Monitoring condition. Ex. 16 (Waiver of Hearing to Modify Conditions of Supervised Release). That Computer and Internet Monitoring condition was a condition precedent to the State of Maine accepting transfer of his supervision.

The D.C. Probation Office's Memorandum dated November 16, 2017 referenced Defendant's Opposition and proffered the rationale for requiring a Computer and Internet Monitoring condition. *See* Prob. Mem., ECF No. 39. The Probation Office notified this Court that certain documents which posed "a potential risk to the public" had been retrieved from Mr. Bernier's computer. Prob. Mem., ECF No. 39, at 2. Mr. Bernier filed a Response to the D.C. Probation Memorandum, whereby he asserted that the documents retrieved from his computer were part of his therapy, which involved "storytelling using Narrative Therapy." *See* Def's Resp. to Prob. Memo., ECF No. 40. Ultimately, the D.C. Probation Office filed its March 23, 2018 Petition, ECF No. 42, alleging that Mr. Bernier had committed ten violations of his supervised release, summarized as follows: (1) possession of an unauthorized laptop; (2) failure to truthfully answer questions asked by the Maine Probation Officer regarding the unauthorized laptop; (3) failure to provide verification of his authorization to participate in "narrative therapy;" (4) participation in an attempted wire fraud, which was later re-characterized by the D.C. Probation Office as unauthorized use of a computer;[2] (5) multiple unreported email accounts; (6) traveling without permission to New Hampshire; (7) failure to truthfully answer questions by the Maine Probation Officer regarding the Computer and Internet Use Questionnaire; (8) commission of a crime regarding his citation in Florida for Lewdness, Exposure of Sex Organs; (9) using an

---

[2] Violation No. 4, involving alleged wire fraud, was later re-characterized by the D.C. Probation Office as a "computer monitoring issue in terms of unauthorized use of the computer," because no money had been lost and no criminal charges were being pursued. *See* Tr. 63, 75.

unauthorized data storage device; and (10) accessing a website that Defendant had not reported to the Maine Probation Officer.

The Court scheduled a Hearing on Violation ("HOV") for April 12, 2018, which was converted into a status hearing when Defendant, through counsel, "contested all ten violations, thus necessitating that this Court set a hearing on the merits where both Defendant and the [United States] Government may present witnesses and exhibits." Apr. 13, 2018 Min. Entry.

On April 13, 2018, the Government filed under seal its position regarding the Defendant's [40] Response to the Probation Memorandum, wherein the Government described Mr. Bernier's "troubling behavior regarding computer usage," including his alleged possible fraudulent attempts to obtain money from an entity in Colorado and a company in Alabama, and Mr. Bernier's alleged email to David Dempsey, a Unit Manager at FCI Fairton, whereby Defendant asked Mr. Dempsey to sign a draft letter that was sent by Mr. Bernier on allegedly official United States Department of Justice/Bureau of Prisons letterhead, which Mr. Bernier had created. *See* Gov't Resp., ECF No. 47, at 3-4. Based on the alleged violations set forth in the Probation Office's March 23, 2018 Petition, and the Government's description of Mr. Bernier's additional alleged behavior involving computer usage, and subsequent to the April 12, 2018 status hearing,

this Court further amended the conditions of Defendant's supervision to add the following additional special conditions:

> 1) You must not engage in an occupation, business, profession, or volunteer activity that would require or enable you to consummate or negotiate any financial contracts without the permission of the probation officer;
>
> 2) You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation officer may share financial information with the United States Attorney's Office; and
>
> 3) You must not access the Internet except with receiving advance permission and supervision from the United States Probation Office.

Apr. 13, 2018 Memo. Op. and Order, ECF No. 46, at 3.

The D.C. Probation Office alleged two additional violations in its April 17, 2018 Probation Petition: (11) accessing the Internet without authorization from the Probation Office to file an annual corporate report; and (12) accessing the Internet without authorization from the Probation Office to send the email to the BOP. *See* April 17, 2018 Probation Petition, ECF No. 49, at 2. In a Probation Petition dated June 2, 2018, ECF No. 55, at 2, the D.C. Probation Office alleged two more violations: (13) accessing the Internet without advance permission and supervision; and (14) failing to truthfully answer questions about his computer activities in the Probation Office.

## **HEARING ON VIOLATION**

On June 7, 2018, the Court held an evidentiary hearing to address all fourteen alleged violations of Mr. Bernier's supervised release. At the hearing, the Court heard argument from the parties regarding their respective positions on each of the alleged violations. Mr. Bernier, through counsel, contested each and every violation while the Government argued that Defendant had violated the conditions of his supervision with respect to all of the violations set forth in the D.C. Probation Office's three Petitions. The Court considers first the violations warranting revocation

of Defendant's supervised release, which have been proven by the Government by a preponderance of the evidence, followed by the remaining violations, which raise issues relating to Defendant's standard of conduct while on supervised release and the need for this Court to monitor his behavior, his use of technology and Internet access, and his financial transactions.

As a preliminary matter, the following persons provided testimony on behalf of the Government during the evidentiary hearing, and the Court credits the testimony of these witnesses: (1) David Dempsey, currently a Unit Manager at the Federal Correctional Institution ("FCI") in Fairton, New Jersey, and formerly an Acting Executive Assistant and Camp Administrator for that facility (as of June 9, 2017); (2) Officer Sarah Howe, employed by the Sanford Police Department in Sanford, Maine; and (3) Probation Officer Kate Phillips from the United States Probation Office for the District of Maine (where Defendant is being supervised). Furthermore, the Court credits the testimony of Dr. Lee Katherine Nicoloff — a clinical psychologist in private practice in South Portland, Maine who treats Mr. Bernier — who testified on behalf of the Defendant during the evidentiary hearing, with regard to Violations No. 3 and No. 12. The Government's exhibits numbered 3 and 8-17 were admitted into evidence. Defendant did not move for the admission of any exhibits into evidence nor did Mr. Bernier elect to testify.[3] Accordingly, the evidence with regard to Violations Nos. 1-2, 4-11, and 13-14 is uncontroverted.

**<u>Violations that Support Revocation of Defendant's Supervised Release</u>**

<u>Violations No. 1 and No. 2</u>

Violation No. 1 is based on Mr. Bernier's alleged possession of an unauthorized laptop, and Violation No. 2 involves his allegedly untrue statements to the Probation Office regarding that

---

[3] The Court questioned him to ensure that this was his voluntary decision. Bernier Tr. 153.

laptop.  *See* March 23, 2018 Probation Petition, ECF No. 42.  Ms. Kate Phillips, Mr. Bernier's supervising Probation Officer in Maine, prefaced her testimony about these two violations by explaining that "[pe]r the [C]omputer and Internet [M]onitoring condition, clients must only use and/or possess a computer that has been approved."  Phillips Tr. 66.  Ms. Phillips indicated that her co-worker Megan Entwistle met initially with Mr. Bernier on August 7, 2017, when his supervision commenced, and Ms. Entwistle reviewed the conditions of his release with him, but Ms. Phillips could not speak to exactly what they discussed.  Phillips Tr. 121-124.  On August 15, 2017, Mr. Bernier "reported into the probation office with a Dell laptop," which was approved by the Probation Office, and "[Ms. Phillips] explained to him that he would need to seek approval for any other device" he wanted to use.  Phillips Tr. 66.  "I had told him that he cannot operate or use another computer without our permission, aside from the Dell he brought in and his iPhone." Phillips Tr. 147.

On August 25, 2017, Ms. Phillips visited Mr. Bernier at his residence and found two laptops in the room that Mr. Bernier identified as his bedroom — the Dell laptop and an ASUS laptop. Phillips Tr. 66; *see* Ex. 3 (8/25/17 receipt of surrendered property, listing the Dell and the ASUS). Mr. Bernier gave up both computers without protest.  Phillips Tr. 135.

Ms. Phillips asked Mr. Bernier about the ASUS computer and why he was using it, and he responded that the ASUS laptop "belonged to his brother, Jim Bernier" and Mr. Bernier was using is "to edit photos from his 35th high school reunion."  Phillips Tr. 67.  Ms. Phillips spoke with Jim Bernier on September 6, 2017, and Jim Bernier said that the ASUS laptop belonged to David Bernier and "it was his laptop from prior to his incarceration and that he did not know why David told [her] that the ASUS laptop belonged to [h]im."  Phillips Tr. 67-68.  When asked: "Did Mr. Bernier ever make any additional statements regarding him telling you that the computer belonged

to his brother," Ms. Phillips responded that Mr. Bernier apologized for "telling [her] untrue information" and he informed her that his brother Jim used the ASUS computer while Mr. Bernier was incarcerated in order to assist Mr. Bernier with a class reunion. Phillips Tr. 71. However, Defendant provided no evidence to support that use of the computer by his brother. Mr. Bernier further explained to her that "upon his release, and having the monitoring condition applied to him, he thought it would be in his best interest to obtain another computer, which would be [the] Dell computer, based on the privileged information that was on the ASUS computer." *Id*.

With regard to Violations No. 1 and 2, the Court finds that the Government has demonstrated by a preponderance that Defendant violated his supervision by possessing an unauthorized laptop — the ASUS computer — and by making false statements about the ownership of that computer. The record before this Court shows that these Violations No. 1 and 2 are uncontested. The ASUS laptop computer was located in Defendant's room and he admitted to using it to edit photos; however, there was no evidence presented to verify this use of the ASUS laptop to edit photos. While Defendant claimed that the computer belonged to his brother, this claim was directly contradicted by statements made by his brother to Probation Officer Kate Phillips, and statements made later, whereby Defendant acknowledged that the ASUS laptop was his but claimed, with no proof, that his brother used it while Defendant was incarcerated. As there is no evidence to support Defendant's claims about the use of the ASUS computer by his brother, the Court does not rely on the Defendant's statements made to the Probation Officer. The Court notes that Mr. Bernier did not specifically contest Violation No. 1, but instead, through counsel, he asserted that it was a technical violation mitigated by lack of experience with the criminal justice system. Tr. 171-172. The Court notes that Mr. Bernier is a well-educated individual (*see* Presentence Investigation Report, ECF No. 22), who *is familiar* with the criminal justice system

insofar as he was convicted of Making False Statements, in violation of 18 U.S.C. Section 1001;

he served a period of incarceration; and he has been on supervised release subject to conditions of

supervision since August of 2017.

<u>Violation No. 3</u>

As a condition of his supervision, Mr. Bernier was to participate in a mental health

treatment program, as approved and directed by the Probation Office. This violation is based upon

Mr. Bernier's alleged failure to provide verification of his authorization to participate in narrative

therapy. *See* March 23, 2018 Probation Petition, ECF No. 42. Ms. Phillips testified as follows:

> On October 10th, 2017, I observed [,] via monitoring software [,] activity on Mr. Bernier's
> computer that involved editing Word documents that appeared to be in the medical field.
> And they were from three different doctors. And several of the documents involved
> moving a signature around. I had questioned Mr. Bernier about these documents. And his
> response was he was editing the medical documents as part of narrative therapy that he
> reported he had engaged in in the past. I had requested verification of his participation in
> narrative therapy. And he has been unable to provide any verification from any former
> practicing clinician or any treatment provider that he has seen in his life to involve
> participation in narrative therapy.

Phillips Tr. 71-72. With regard to Violation No. 3, Mr. Bernier was the one who raised the concept

of narrative therapy with Ms. Phillips, telling her that it was a "therapeutic modality that he in the

past had used during his therapeutic sessions." Phillips Tr. 135-136. Mr. Bernier told Ms. Phillips

he was "currently practicing narrative therapy" but he did not say he was practicing it with his

current psychologist, only that he had practiced it with "a former treatment provider." Phillips Tr.

136, 149.

In the Fall, Ms. Phillips contacted Mr. Bernier's current therapist, Dr. Lee Katherine

Nicoloff, regarding Defendant's participation in any narrative therapy, and Dr. Nicoloff stated "she

was unable to verify that [Defendant's] activity was part of narrative therapy[.]" Phillips Tr. 72-

73. Ms. Phillips noted that Mr. Bernier's treatment summary, dated March 6, 2018, which covered

the period from August 11, 2017 to March of 2018, does not mention anything about narrative therapy or the aforementioned three documents, nor has Mr. Bernier provided any documentation justifying his use of narrative therapy with regard to the creation of those documents. Phillips Tr. 73- 74.

Dr. Nicoloff was called by the Defendant to testify with regard to the allegations related to Violation No. 3. Dr. Nicoloff is a clinical psychologist who treats patients with posttraumatic stress disorder ("PTSD"), and she has been Mr. Bernier's treating psychologist since August of 2017, seeing him on average once a week, while "us[ing] a variety of treatment modalities." Nicoloff Tr. 105-107. Dr. Nicoloff indicated that she is treating Mr. Bernier for PTSD, anxiety and depression, and further, that Mr. Bernier exhibits a "number of obsessive compulsive characteristics" which include "perfectionism and excessive attention to detail, [and] a need for objects to be in order and symmetrical," but she denied that he has obsessive compulsive disorder. Nicoloff Tr. 107-108, 110.

Dr. Nicoloff stated that she is familiar with narrative therapy, which is an accepted form of psychotherapy treatment, but she does not use it in her practice nor is she familiar with other psychologists who use it. Nicoloff Tr. 108. Dr. Nicoloff described narrative therapy as follows:

> The philosophy of narrative therapy is that we all carry layers of stories about ourselves that influence how we experience our lives. The narrative is a thread that connects experiences in a way that helps them make sense to us, helps us understand ourselves and our experiences. The assumption of narrative therapy is that by re-authoring those narratives, one can change how they think and feel about events and experiences in their life.

Nicoloff Tr. 108-109.

Dr. Nicoloff confirmed that she has never used narrative therapy with Mr. Bernier. Nicoloff Tr. 111-112. She acknowledged that Mr. Bernier showed her his binder of self-help

materials, which included a description of — and articles about — narrative therapy, as well as exercises prepared by him relating to narrative therapy, and a book called What is Narrative Therapy. Nicoloff Tr. 115-116. In response to the Government's question whether Dr. Nicoloff had provided the Probation Office with any documentation that Mr. Bernier is authorized to engage in narrative therapy, Dr. Nicoloff stated "[n]o" but added that "[i]t's not really a matter of authorization. As far as narrative therapy exercises go, Mr. Bernier is free to do whatever he feels would be helpful to him." Nicoloff Tr. 116-117. Dr. Nicoloff did however scoff at the idea that narrative therapy would "involve the creation of false government documents that will be sent to other people." Nicoloff Tr. 113.

Defendant, through counsel, argued that this is not a significant violation, which would warrant revocation, because the evidence shows that narrative therapy is an accepted modality and any documents that Mr. Bernier created on his computer were not sent out. Tr. 173-174. While the Court agrees that narrative therapy is an accepted modality and there is no evidence in the record that the documents created by Mr. Bernier were sent out, Mr. Bernier was unable to provide the Maine Probation Office with verification from any former practicing clinician or any treatment provider that he has seen regarding his participation in narrative therapy. The Defendant's conditions of supervision require that he participate in mental health treatment at the direction of his Probation Officer, who monitors such treatment. Although narrative therapy is a recognized therapy, it is significant that Mr. Bernier engaged in this therapy without the supervision of a therapist or without informing his Probation Officer. Furthermore, his creation of false documents would not be consonant with the practice of narrative therapy. Accordingly, the Court finds that the Government has demonstrated by a preponderance of the evidence that Defendant violated his supervision by failing to provide the Probation Office with documentation or authorization that

affirms Mr. Bernier's participation in narrative therapy. Dr. Nicoloff testified that she does not employ narrative therapy with Mr. Bernier or her other patients nor would narrative therapy include the falsification of documents to be sent to others. In sum, Defendant failed to proffer any information that suggests that narrative therapy was part of any prior or current treatment regimen as opposed to something he did/does on his own, or that such narrative therapy would include the falsification of documents, and thus, Violation No. 3 is uncontroverted.

Violations No. 5 and No. 7

On September 4, 2017, as required by the Computer and Internet Monitoring condition relevant to this supervision, Mr. Bernier completed a Computer and Internet Use Questionnaire ("Questionnaire"), which requires that he list any and all email accounts. *See* Ex. 8 (Questionnaire dated 9/4/2017), at 3. Violations Nos. 5 and 7 involve Defendant's alleged possession of multiple email accounts (Violation No. 5), reflected on Defendant's cellphone on January 29, 2018, which were not reported to the Probation Office in the Questionnaire and the subsequent submission of an allegedly altered Questionnaire, which includes those email accounts and relates to Defendant's failure to truthfully answer questions asked by his Probation Officer. (Violation No. 7). *See* March 23, 2018 Probation Petition, ECF No. 42; *see also* Ex. 9 (screen shot of email accounts on Defendant's phone); Ex. 8 (original Questionnaire); Ex. 11 (email dated 2/01/18, including a copy of a [modified] Questionnaire dated 9/4/2017).

Ms. Phillips testified that when Mr. Bernier completed the Questionnaire (Ex. 8) on September 4, 2017, he only listed one email address, but when they looked at Defendant's

telephone in January 2018, there were seven different accounts listed, including the one he identified. Phillips Tr. 79.

With regard to the alleged alteration of the Questionnaire, Ms. Phillips testified that Mr. Bernier emailed her on February 1, 2018, and attached a Computer and Internet Use Questionnaire (Ex. 11) that has the same date as the September 4, 2017 Questionnaire (Ex. 8), but it lists five email accounts instead of one. Phillips Tr. 80-81. Ms. Phillips recollected receiving the original Questionnaire (Ex. 8), which listed one email address, on September 4, 2017. Phillips Tr. 81.

Ms. Phillips' summary of these two violations is as follows:

> When Mr. Bernier originally submitted the [C]omputer and Internet [U]se [Q]uestionnaire in September, it contained one email address. We confronted him on the multiple email addresses discovered on his iPhone in late January 2018. And he acknowledged he had those email addresses. After that conversation, he sent myself and a supervisor an email containing another [C]omputer and Internet [U]se [Q]uestionnaire which was also dated September 4th, 2017, but also contained multiple other email addresses that we reviewed. I spoke with him on the phone on February 1st, 2018, and confronted him about this altered document as it did not reflect the document submitted to our office. And I provided him with multiple opportunities to explain why he added information, namely the email addresses. And he denied that he altered that original form that was submitted in September.

Phillips Tr. 86.

The Court finds that the Government has shown by a preponderance of the evidence that Mr. Bernier violated the conditions of his supervised release insofar as the Maine Probation Office found numerous unreported email accounts on his iPhone, which were not listed as required in the original September 4, 2017 Questionnaire (Ex. 8). Defendant claimed that these email addresses were included on the "September 4, 2017" Questionnaire, and he submitted a copy of the Questionnaire (containing these email addresses) to the Probation Office on February 1, 2018. While Defendant denied altering that Questionnaire, he proffered absolutely no explanation to account for the inconsistency between the first September 4, 2017 Questionnaire (Ex. 8) (which

lists one email account) and the second "September 4, 2017" Questionnaire (Ex. 11) (which lists five email accounts). In contrast, Ms. Phillips testified that she remembered receiving the original Questionnaire (Ex. 8), which listed one email account, while the second Questionnaire was not received until February 1, 2018. There is nothing in the record before this Court that demonstrates otherwise, and accordingly, the Court finds further that the Government has shown by a preponderance of the evidence that Defendant violated the conditions of his supervised release when he denied submitting an altered Questionnaire listing his email accounts and failed to truthfully answer questions posed by the Probation Officer.

Violation No. 6

Violation No. 6 pertains to Defendant's alleged unauthorized travel to New Hampshire on December 18, 2017, which violates the standard condition of supervision that Defendant is required to first obtain permission from the Probation Officer before leaving the judicial district where Defendant resides. *See* March 23, 2018 Probation Petition, ECF No. 42. Ms. Phillips testified that, on January 30, 2018, the Maine Probation Office conducted a search of the Defendant's iPhone and found evidence that he had been in Portsmouth, New Hampshire on December 18, 2017. Phillips Tr. 82-83; *see* Ex. 10 (iPhone screen shot of trip details, map and photos re: Portsmouth). Ms. Phillips confirmed with an employee of the Motel 6 in Portsmouth, New Hampshire that Mr. Bernier checked into that hotel on December 18, 2017 through December 19, 2017. Phillips Tr. 83.

On January 31, 2018, Mr. Bernier reported to the Maine Probation Office and when Ms. Philips indicated that there was evidence that he traveled to New Hampshire without permission, he denied it. Phillips Tr. 84-85. Subsequently, Mr. Bernier told Ms. Phillips that he traveled to Portsmouth to get medicine for his mother and "he ran into inclement weather and was forced to

get a motel for the evening."  Phillips Tr. 85.  Ms. Phillips acknowledged that Mr. Bernier has traveled previously to New Hampshire on several occasions, after receiving permission to do so, and the reasons for those visits were for medication and doctor's appointments for his mother. Phillips Tr. 142-143.

Defendant conceded that this trip, unlike his prior trips, was taken without permission, but he alleges that he went for the purpose of obtaining medicine for his mother, and he ended up spending the night because of inclement weather. Tr. 174-175.  No proof was offered by Defendant to confirm that he traveled to New Hampshire for the purpose of obtaining medication for his mother, or that any medication was obtained; therefore, there is no basis for this Court to rely upon Mr. Bernier's explanation for the purpose of this trip.  Defendant, through counsel, characterized this violation as a technical violation with a mitigating factor.[4] Tr. 175-176.  The Court finds that the Government has demonstrated by a preponderance of the evidence that Mr. Bernier violated the conditions of his supervised release by traveling without prior permission to Portsmouth, New Hampshire and lying about going, and therefore, this Violation No. 6 is uncontested.

Violation No. 9

Violation No. 9 alleges that Defendant failed to participate and comply with the requirements of the Computer and Internet Monitoring Program, specifically, that he used an unapproved data storage device on February 14, 2018.  *See* March 23, 2018 Probation Petition, ECF No. 42.  Ms. Phillips explained this violation as follows:  "On February 16, 2018, I was reviewing [Defendant's] computer activity via the monitoring software and observed items being copied from a Documents folder to a USB drive E.  And at this point in time, there was no approved

---

[4] Defense counsel asserted that there are mitigating factors associated with certain violations. While these factors do not negate the substance of the violations, they may be considered at the time of sentencing.

- - Mr. Bernier had not been approved to possess or use a USB drive." Phillips Tr. 88; *See* Ex. 13 (screen shot of Defendant's computer screen from February 2018, showing USB device). When Ms. Phillips talked to Mr. Bernier about the USB drive, he admitted to her, after being confronted, that "he was using it because his computer had evidenced a blue screen, meaning it crashed." Phillips Tr. 145.

On cross-examination, Defendant's counsel asked Ms. Phillips if "thumb drives are [ ] mentioned" in the Computer and Internet Acceptable Use Contract ("Contract') that she and Mr. Bernier signed in September of 2017. Phillips Tr. 124, 141. Ms. Phillips responded in the affirmative, noting that paragraph 34 therein says "You shall not possess or use removable media; for example, a USB flash drive" configured with a "bootable operating system." Phillips Tr. 144 While Ms. Phillips was unaware of whether the USB drive used by Mr. Bernier had a "bootable operating system," she noted that paragraph 9 of the Contract prohibits the use or ownership of any other computer hardware that is not approved. Phillips Tr. 144.

Accordingly, upon Defendant's own admission that he used the USB device without permission, the Government has demonstrated by a preponderance of the evidence that Mr. Bernier used an unapproved data storage device and thus violated the conditions of his supervision, and this violation is uncontested.

Violation No. 10

Violation No. 10 involves an alleged violation of the Computer and Internet Monitoring Program on March 19, 2018 when Mr. Bernier accessed a website that he failed to report to the Maine Probation Officer. *See* March 23, 2018 Probation Petition, ECF No. 42. Ms. Phillips stated that, on his original Questionnaire, Mr. Bernier listed one website - sanfordhigh1982 – as a website where he had "privileges to receive, send and/or store information" but he did not list the "Down

East Senior Housing website, which was operated through a GoDaddy domain." Phillips Tr. 90; Ex. 8 [website list on Questionnaire]. Phillips Tr. 91. Ms. Phillips testified that even on the Questionnaire attached to the February 1, 2018 email sent by Defendant, only the sanfordhigh1982 website is listed. Phillips Tr. 91, Ex. 8 [website list on Questionnaire]; Ex. 11 [same].

On March 19, 2018, the date of the alleged website access by Mr. Bernier, he provided the Maine Probation Office with another Computer and Internet Use Questionnaire where he lists downeastseniorhousing.org as a website that he operates or uses. Phillips Tr. 94; *see* Ex. 14 (March 19, 2018 Computer and Internet Use Questionnaire). Mr. Bernier's after-the-fact reporting of his website access, by means of the March 19, 2018 Questionnaire, does not counter his violation in accessing the Down East Senior Housing website without providing prior notification to the Maine Probation Office, and accordingly, the Government has demonstrated by a preponderance of the evidence that Mr. Bernier violated the conditions of his supervision by accessing a website without reporting it to the Probation Office, and this violation is uncontroverted.

Violation No. 11

Violation No. 11 involves an alleged failure by the Defendant to participate and comply with the requirements of the Computer and Internet Monitoring Program, by allegedly accessing the Internet without authorization on March 9, 2018. Phillips Tr. 92. Ms. Phillips indicated that she had obtained a 2018 Florida not-for-profit corporation annual report that was allegedly filed by Mr. Bernier on March 9, 2018, which was at a time when Mr. Bernier "could use a computer in the probation office," but he was not in the office on that date, and "he did not have permission to use another computer at all." Phillips Tr. 92. *See* Ex. 15 (2018 Florida not-for-profit corporation annual report with a file stamp of March 9, 2018). There is nothing in the record before this Court to counter the Government's claim that Mr. Bernier accessed the Internet without authorization,

and accordingly, by a preponderance of the evidence, the Court finds that Mr. Bernier violated the conditions of his supervision as set forth in Violation No. 11, and this violation is uncontested.

Violation No. 12

Violation No. 12 involves Mr. Bernier's alleged failure to participate and comply with the requirements of the Computer and Internet Monitoring Program insofar as the Defendant accessed the Internet without authorization on April 7, 2018, and he sent an email to the Bureau of Prisons requesting assistance with a legal matter. *See* March 23, 2018 Probation Petition, ECF No. 42. Ms. Phillips testified that Defendant's actions constitute a violation of the Computer and Internet Monitoring Program because "[a]t the time that the Bureau of Prisons received that email and document from Mr. Bernier, he did not have permission or an authorized computer or permission to use a computer." Phillips Tr. 95. In the event that Defendant was going to use the Maine Probation Office's computer, he had to get advance permission and he was supposed to advise the Maine Probation Office as to "what he [was] using it for." Phillips Tr. 96.

The Government's witness David Dempsey, a unit manager at FCI Fairton, testified regarding the receipt of that email from Mr. Bernier. Upon questioning by Government counsel, Mr. Dempsey described first being a witness to a Waiver form that was signed by Mr. Bernier, who was then an inmate incarcerated at FCI Fairton. Dempsey Tr. 14-15; *see* Ex. 16 (June 19, 2017 Waiver of Hearing to Modify Conditions of Supervised Release ("Waiver")). Mr. Dempsey described the Waiver as a "condition of supervised release for Mr. Bernier [who] was requesting to relocate his supervision to Maine" and it "imposed upon him some computer monitoring." Dempsey Tr. 14. Mr. Dempsey testified that he "presented Mr. Bernier with the document, explained it to him and what his options were, if he wanted to accept the conditions or not."

Dempsey Tr. 14. When confronted with the document, Mr. Bernier "wasn't happy with the document, but he "chose to sign the document so he could release to Maine." Dempsey Tr. 14. Mr. Dempsey asserted that he did not force or coerce Mr. Bernier to sign anything. Dempsey Tr. 14-15.

Mr. Dempsey testified next about receiving an email from Mr. Bernier on April 7, 2018. Dempsey Tr. 15-18; *see* Ex. 17 (email from Mr. Bernier to Mr. Dempsey dated April 7, 2018, with attached draft Memorandum). In the email, Mr. Bernier asked Mr. Dempsey to confirm that Defendant had signed the Waiver "under duress."[5] Ex. 17 (email). Mr. Dempsey testified that:

> [Mr. Bernier] had drafted a proposal letter for [him]. And it had an attachment on it with the Bureau of Prison's letterhead, very similar to the letterhead that we use in the Department of Justice, the Bureau of Prisons. And he had already wrote a letter for me that said that he signed the document under duress. He wrote it for me. He was asking me to sign it, I guess, so he could use it for his own purpose.

Dempsey Tr. 17; Ex. 17 (attached draft Memorandum). Mr. Dempsey confirmed that he never authorized Mr. Bernier to draft that Memorandum, and stated that "I knew right away when I read it[,] it was definitely not true." Dempsey Tr. 17-18.

On cross-examination of Mr. Dempsey, Mr. Bernier's counsel established that case managers usually review documents such as the Waiver in this case with the person in custody; however, Mr. Dempsey presented it to Mr. Bernier because the case manager was not present that day. Dempsey Tr. 22. Mr. Dempsey testified he did not have any "contact with the caseworker

---

[5] Pursuant to D.C. Civil Jury Instruction 11-30: "A party may cancel a contract if he proves that he entered into the contract as a result of duress. Duress is an improper threat by one party that deprives the other party of the free exercise of his will and judgment, leaving him no reasonable alternative but to enter into the contract. To be an improper threat, the threat must be of wrongful conduct. Also, the threat must involve an imminent injury, as opposed to an uncertain injury that would not occur until sometime in the indefinite future."

about the substance of this particular document" because "[t]here was no need to." Dempsey Tr. 23. Mr. Bernier did not have counsel present when he signed the Waiver and Mr. Bernier did have "a couple questions" about the document; namely, he was "trying to understand why these restrictions were being presented to him." Dempsey Tr. 20-21. The Court notes that there is no evidence in the record that Mr. Bernier requested the presence of counsel while he was meeting with Mr. Dempsey. *See also* Ex. 16 (Waiver) (stating that the Defendant "waive[s] his statutory right to a hearing and to assistance of counsel"). Mr. Dempsey did not recall that Mr. Bernier had "any questions that were unanswered at that time," and he recollected that Mr. Bernier "was told he d[id] not have to sign the form," but he "chose to sign the form," and it was done "willingly; and everything was completely understood at the time." Dempsey Tr. 21-22. Mr. Bernier did not ask for additional time to consider the Waiver. Dempsey Tr. 27. "He didn't like the conditions, but he totally accepted them because he knew to release back to Maine he had to accept the conditions the Courts were imposing." Dempsey Tr. 27; Dempsey Tr. 29 ("It was a condition for the relocation of his supervision to go to Maine.")

Mr. Dempsey acknowledged that he views the Memorandum drafted by Mr. Bernier as a "letter [Mr. Bernier] drafted for me" that Mr. Dempsey was "not require[d]" to sign but was asked to sign. Dempsey Tr. 25. Mr. Dempsey did however find the Memorandum "deceptive" because it was written as if on official government letterhead and Defendant raised the issue of duress, while Mr. Dempsey testified that "[t]here was no duress at all." Dempsey Tr. 25-27.

There was additional testimony relating to Defendant's creation and use of BOP letterhead from Dr. Nicoloff. First, Defendant's counsel asked Dr. Nicoloff if she had seen the "documentation related to a form or a letter generated by Mr. Bernier that had the Bureau of Prisons

letterhead on it," and she affirmed that she had. Nicoloff Tr. 109. Next, counsel asked for Dr. Nicoloff's opinion on how "Mr. Bernier's psychological or psychiatric problems caused the generation or impacted the generation of that letter" and she opined that "the way he wrote the entire letter, I think, is a direct result of his need for things to be done in a certain way to be symmetrical, to have many details and to execute things himself rather than delegate the task of letter-writing to someone else." Nicoloff Tr. 109-110. Dr. Nicoloff noted that Mr. Bernier's "psychological traits" consistent with the drafting of the letter are his "excessive attention to detail" and "difficulty delegating" and "the need to perform tasks himself to make sure that they're done adequately." Nicoloff Tr. 111.

Defendant's counsel urged the Court to focus on the form of the email that accompanied the draft letter, whereby Mr. Bernier did not "put a false name on this, try to disguise himself [nor did he] try to conceal his identity [or] try to misrepresent what he was doing." Tr. 169. Defense counsel conceded that it should not have been put on BOP letterhead, but he asserted that the drafting of letter could be explained by looking at the Defendant's personality traits. Tr. 170. He asked the Court to look at the intent behind the drafting of the letter and argued that Mr. Bernier's medical history, trauma, difficulties and psychological problems should be taken into account as mitigating factors. Tr. 170-171.

The Government focused on Mr. Bernier's unauthorized use of a computer and accessing the Internet, but the Government also raised the issue that Mr. Bernier used the computer to "not only communicate with a Bureau of Prisons official, but to create a fraudulent BOP document on government letterhead that he had no authorization to do so, to send to this official for his signature." Tr. 161-162. For purposes of addressing Violation No. 12, the Court focuses on Defendant's unauthorized use of a computer and access to the Internet, as opposed to the contents

of the Memorandum and the Defendant's use of BOP letterhead, which was created by him. As such, the Court finds that the Government has shown by a preponderance of the evidence that Mr. Bernier violated the conditions of his supervision by accessing the Internet without authorization, and this violation is uncontested.

<u>Violations No. 13 and No. 14</u>

These two violations are based upon Mr. Bernier's May 15, 2018 alleged use of the computer in the lobby of the Maine Probation Office without obtaining advance permission (Violation No. 13) and his alleged failure to truthfully answer questions about that computer usage (Violation No. 14). Ms. Phillips testified that, on May 15, 2018, Mr. Bernier "reported into the probation office and used the lobby computer without notifying myself or obtaining permission to use it." Phillips Tr. 99. Ms. Phillips was not present at the office, but her coworker notified her, and Mr. Bernier admitted later to using the computer, although he stated "he was not aware he needed permission to use the lobby computer." Phillips Tr. 99-100. When cross-examined as to whether there is any requirement in the aforementioned Computer and Internet Acceptable Use Contract whereby Mr. Bernier needs "to get specific approval from the United States Probation Office to use their computers," Ms. Phillips responded that Condition No 5 in the Contract states "You shall not use any other computer than the one you have been authorized to use," which she interpreted as applying to "any computer [which] would encompass the probation computer," but she agreed that it did not specifically reference the computer at the "United States Probation Office." Phillips Tr. 125. With regard to Mr. Bernier's May 15, 2018 computer usage at the Maine Probation Office, Ms. Phillips did not state that Mr. Bernier was "permitted" to use the computer that day, but rather, she stated that "to [her] knowledge, no one told him not to [use it] while he was in the office." Phillips Tr. 99. When cross-examined about her knowledge of

whether Mr. Bernier received prior approval to use the computer that day, she noted that she was not there on May 15, 2018, and "had not spoken with him to give that approval." Phillips Tr. 130. When Defendant's counsel asked whether Ms. Phillips was aware that "the receptionist provided Mr. Bernier with approval to use the computer that day," she stated that she was not aware of that and had not spoken to or been told that by the receptionist, and it was her understanding the receptionist would not have that authority. Phillips Tr. 130-131, 148.

While Defendant's counsel raised the issue of a receptionist at the Maine Probation Office having provided permission for Mr. Bernier to use the computer, there was no testimony by Mr. Bernier to that effect nor was the receptionist called as a witness or any sworn affidavit proffered. Accordingly, the Court finds that the Government has established by a preponderance of the evidence that Mr. Bernier violated the conditions of his supervision by using the Maine Probation Office computer without permission on May 15, 2018 (Violation No. 13).

With regard to Violation No. 14, Ms. Phillips stated that she "asked [Mr. Bernier] what he did while he was on the computer" and he responded that "he looked only at his hotmail email account," but from a "review of the computer activity during the time frame that Mr. Bernier was using it, there appears to be other websites visited; and there is a document that was in the recycling bin, and he also attempted to erase the [browsing] history." Phillips Tr. 101. The document that was in the recycling bin was a "W-9 request for taxpayer identification and certification with [Defendant's] name and Down East Senior Housing listed on it as well as his home address." Phillips Tr. 101. Accordingly, based on Ms. Phillips uncontested testimony, the Court finds that the Government has established by a preponderance of the evidence that Mr. Bernier failed to

truthfully answer questions regarding his computer activity at the Maine Probation Office on May 15, 2018.

### **Violations that Support this Court's Continued Monitoring of Defendant's Behavior, Use of Technology and the Internet, and Financial Transactions**

Violation No. 4

Violation No. 4 initially revolved around alleged wire fraud, but the Court noted during the evidentiary hearing that this had been subsequently modified to "put [it] in the context of computer monitoring" and accordingly, the focus was on whether "there [was] anything in terms of these events that suggest[ed] that [Defendant] used the computer in an unauthorized way." Tr. 75, 133. *See* Phillips Tr. 149 (agreeing that "Probation has since amended [Violation No. 4] to be a violation of the computer and Internet monitoring requirements.") With regard to Violation No. 4, Ms. Phillips noted the basis for Violation No. 4 as follows:"[i]t appears that [Defendant] altered his email address and sought funds from three different [entities] with no basis for the funds to be deposited into an account where he is the authorized user." Phillips Tr. 75. The three entities are: Reverse Mortgage Funding in New Jersey; the Colorado Housing Authority in Bridgeton, Colorado; and Jason Meredith, a CPA for a company in Birmingham, Alabama. Phillips Tr. 75-76. Ms. Phillips could not state with certainty that Defendant had altered his email address, but she noted that the information for all three entities was consistent insofar as "the accounts payable department . . . received emails from what appears to be an internal employee, someone who could authorize funds to be released . . . and they were going to Mr. Bernier's address to the account that his name is on, the Down East Senior Housing." Phillips Tr. 76. Ms. Phillips acknowledged that no forensic analysis was performed on the emails and she had no idea from a forensic

standpoint how to determine if an email had been altered, so she could not say "with 100 percent certainty" that the emails were altered. Phillips Tr. 138-139.

In terms of the status of the investigation into these incidents, Ms. Phillips confirmed that she was informed by means of a police report that the investigation in Colorado is inactive, but she was uncertain whether the investigation in Alabama is active or inactive.[6] Phillips Tr. 76-77, 131. It was Ms. Phillips' understanding that the state of Maine had not opened up an investigation with respect to the Colorado matter. Phillips Tr. 132. "As far as [she] kn[ew], there's no investigation anywhere in the United States related to that alleged violation of the law" (the transfer of money from Colorado) "[o]utside of the US probation office," and "no grand jury convened" regarding the Colorado matter. Phillips Tr. 133. When asked the same questions about the Alabama matter, she indicated that she was unaware of any grand jury investigation and has not been contacted by the Alabama police regarding that incident. Phillips Tr. 134.

Police Officer Sarah Howe testified on behalf of the Government with regard to Violation No. 4. Ms. Howe is a patrol officer with the Sanford Police Department in Sanford, Maine. Howe Tr. 34. On January 9, 2018, she received a call from Peter Lifari, a representative at Adams County Housing Authority located in Bridgeton, Colorado, who informed her that his company had been the victim of a theft, and a check in the amount of $86,220.00 had been mailed to David Bernier of Sanford, Maine. Howe Tr. 34-35. Officer Howe contacted Mr. Bernier who stated that he had received the check and had taken it to the bank to cash it, because he was expecting a check "for what he said were professional fees from a loan company [Premier Fast Loans] for starting up

---

[6] There was no further discussion about the New Jersey transaction during the hearing.

a senior housing facility here in Sanford, Maine." Howe Tr. 36. The bank put a hold on the check, and it was not ultimately cashed. Howe Tr. 41.

Mr. Bernier provided Officer Howe with emails between himself and Premier Fast Loans ("PFL") but no copy of any loan application. Howe Tr. 37. When Officer Howe tried contacting PFL at the email address given, she received a response from someone whose English was grammatically poor and which did not "reflect any justification for a loan in the amount of $86,000." Howe Tr. 37-38.

Around January 16, 2018, Mr. Bernier contacted Officer Howe to report that when he pulled his credit report, he found numerous unauthorized inquiries, and further, that Mr. Mayor, the president of PFL, had told him PFL had experienced computer breaches, and thus, Mr. Bernier believed himself to be a "victim of identity theft." Howe Tr. 38.

On March 18, 2018, Officer Howe received an email from Jason Meredith, a CPA with a company in Birmingham, Alabama, and he stated that unauthorized checks, in the amount of $41,350 and $19,550, had almost been mailed from his company via FedEx to David Bernier, but he had intercepted them before they went out to the post office. Howe Tr. 39, 41-42. What prompted these checks being mailed was an "email [which appeared to be from Mr. Meredith] sent to [ ]accounts payable asking to cut a couple of checks" to be "overnighted to a David Bernier." Howe Tr. 39. Officer Howe spoke to Mr. Bernier again and "he said he was the victim of a scam and that it was identity theft." Howe Tr. 39-40. When Mr. Bernier talked to Officer Howe about the Alabama and Colorado incidents, he was very cooperative and she did not force him to answer

questions. Howe Tr. 61. Officer Howe thought the Alabama investigation was still open, but she could not confirm whether the Colorado investigation was still open or not. Howe Tr. 38-39.

On cross-examination by Mr. Bernier's counsel, Officer Howe acknowledged that Defendant did not have counsel present when he spoke to her. Howe Tr. 52-53. Defendant's counsel established that Officer Howe did not try to confirm the physical address for PFL, but rather, she contacted PFL via email and received a response from Mr. Mayor, "who is supposed to be the president of Premier Fast Loans, and it [ ] [came] from their email address," so she "had no reason not to believe the authenticity of that email." Howe Tr. 53-55. Officer Howe admitted further that she did not investigate any alleged breaches of security on behalf of PFL since the company is located in London. Howe Tr. 55-56. Ultimately, Officer Howe testified that she did not attempt to confirm Mr. Bernier's social security number, or investigate Mr. Bernier's claim of identity theft because "he was the one who received the check" . . . and she did not consider him a victim "because when you are a victim of identity theft, you don't generally get mailed a check for money." Howe Tr. 48-51, 56. Furthermore, Mr. Bernier had emailed her to say he had pulled his credit report and there were unauthorized inquiries, but he did not provide a copy of it to Officer Howe or attempt to pinpoint any fraudulent activity. Howe Tr. 57-58. Nor did Mr. Bernier indicate that he had suffered any financial loss. Howe Tr. 60.

With respect to Violation No. 4, the Government argued that it showed "that it is more likely than not that it was this Defendant who used an unauthorized email account to request money from the housing authority to Colorado, money he was not entitled to" because it "belies logic" that a "hacker is going to hack into someone's computer and have the money sent to an individual who is a victim." Tr. 158-159. Furthermore, while Defendant claimed he was waiting on a loan

when he received and deposited the approximately $86,000.00 check, he never provided any loan documents to Officer Howe, instead giving her only an email address for Premier Loans. Tr. 159.

Defendant, through counsel, focused on the fact that the Colorado case was closed, and "there's no grand jury in Colorado, Maine, or anywhere related to an investigation of this." Tr. 164-165. Defendant's counsel raised issues about Premier Loans' email having been hacked and noted that Officer Howe was able to contact Premier Loans, and further, that Defendant was waiting on some funding from Premier when he received a check, and finally, that there was no forensic expert to make a determination regarding any alternation of emails. Tr. 165-166.

In equipoise, the Court finds Defendant's allegation of identity fraud unbelievable because it is implausible that a hacker would send a check to his "victim" and furthermore, the Court notes that it should have been obvious to Mr. Bernier that the check he received did not come from Premier even while the Defendant attempted to cash it. The Court finds however that the Government has not demonstrated Violation No. 4 by a preponderance of the evidence because the emails that triggered checks being written and sent to Mr. Bernier have not been sufficiently tied to Mr. Bernier, and it is unclear whether any investigation into these matters is still pending. The Court notes that the suspicious activity surrounding the Colorado and Alabama incidents, whereby Mr. Bernier was the intended beneficiary of checks that were written based on fraudulent "internal" emails within a business entity, may be used to justify the continued monitoring of the Defendant's computer and financial transactions by the Maine Probation Office.

Violation No. 8

Violation No. 8 is based on Mr. Bernier's commission of another federal, state, or local crime, when he was cited by the Hollywood, Florida Police Department for Lewdness, Exposure of Sex Organs on February 8, 2018. *See* March 23, 2018 Probation Petition, ECF No. 42. Ms.

Phillips affirmed that she received a copy of a police report from the Broward County, Florida Police Department dated February 8, 2018. Phillips Tr. 87; *see* Ex, 12 (Police Report from Broward County, Florida, charging Lewdness Exposure of Sex Organs pursuant to FSS 800.03).[7] Ms. Phillips testified that Mr. Bernier had permission to go to Florida for "a medical procedure that he provided verification for." Phillips Tr. 88. There is no indication from the record before this Court whether or not Defendant obtained any medical treatment in Florida during the February 2018 visit. Ms. Phillips indicated that she and the Defendant had a conversation about this new criminal conduct in her office on February 16, 2018, and Mr. Bernier "verbally acknowledged to [her] that he had his penis exposed but that he was discreet." Phillips Tr. 87. Basically, Defendant admitted "that his penis was exposed, but den[ied] that he was masturbating." Phillips Tr. 88. With regard to the current status of Defendant's case in Florida, Ms. Phillips has informed this Court that the hearing that was set for June 14, 2018 was continued to September 20, 2018, and the prosecutor will be pursuing adjudication for the offense as opposed to diversion because of Mr. Bernier's criminal history.

Defendant, through counsel, argued that this Court does not have enough information about the Florida charges to support a violation, "until we hear from the State Attorney's Office, because they're in charge of that investigation, whether or not it can go forward." Tr. 168-169. Government counsel asserted that Defendant "admitted to Officer Phillips that he was actually at

---

[7] *See* West's F.S.A. §800.03 (Exposure of Sexual Organs) ("It is unlawful to expose or exhibit one's sexual organs in public or on the private premises of another, or so near thereto as to be seen from such private premises, in a vulgar or indecent manner, or to be naked in public except in any place provided or set apart for that purpose.") To prove the crime of Exposure of Sexual Organs, these elements must be proven beyond a reasonable doubt: (1) the defendant exposed or exhibited his sexual organs or was naked; (2) the defendant did so in a public place. . . , (3) the defendant intended the exposure or exhibition of his sexual organs or nakedness to be in a vulgar, indecent, lewd, or lascivious manner; (4) the exposure or exhibition or nakedness was in a vulgar, indecent, lewd, or lascivious manner. Fla. Std. Jury Instr. (Crim.) 11.9.

the location [and] [h]e was arrested and he had his penis outside of his pants, which I understand is part of the basis for that crime." Tr. 157-158. The Court acknowledges that there is no dispute that Defendant has been charged with a crime in Florida; however, because of the uncertainty of the status of the case pending in Florida, this Court finds that it is premature to make a determination regarding Defendant's violation of the conditions of his supervision with regard to his alleged commission of a crime. That does not preclude the Court from considering this activity as grounds for continued monitoring of Defendant's behavior and his use of technology and the Internet. The Court notes that Defendant received permission to travel to Florida for medical treatment and while he was there, he engaged in conduct that is incompatible with acceptable conduct for someone who is on supervised release, and which could ultimately lead to additional incarceration.

Violations No. 3 and 12 (Creation of False Documents)

While the Court has already determined that the Government has demonstrated Violations No. 3 (failing to provide verification of narrative therapy) and 12 (accessing the Internet without authorization) by a preponderance of the evidence so as to support the revocation of Defendant's supervised release, the Court further notes that it is troubled by the allegations underlying these violations; *i.e.*, that Defendant was creating false medical documents online (Violation No. 3) and creating false letterhead (Violation No. 12). These type of activities reflect on the Defendant's veracity, and they are similar in nature to the criminal conduct underlying Defendant's conviction and sentence for Making False Statements. As such, they provide this Court with further

justification to monitor the Defendant's behavior, his use of technology and the Internet, and his financial transactions.

## APPLICABLE LAW AND SENTENCING GUIDELINES

In this case, the Court indicated that "[if] I decide that I'm revoking [supervision], then I'll give you another opportunity to argue about the appropriate sentence, because you need to see what my findings are, frankly." Tr. 179. Accordingly, the Court will set a briefing schedule prior to any resentencing hearing. The applicable law and sentencing guidelines are set forth below.

The Court's disposition of supervised release violations is governed by 18 U.S.C. § 3583. *See* Fed. R. Crim. P. 32.1(d); 18 U.S.C. § 3583. Specifically, § 3583(e) directs courts to consider several factors drawn from 18 U.S.C. § 3553, including: (1) the history and characteristics of the defendant; (2) the need for the sentence imposed to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; and (3) the kinds of sentences and the sentencing range established in the Sentencing Guidelines for the applicable category of offense committed by the applicable category of defendant. 18 U.S.C. § 3583(e); 18 U.S.C. §§ 3553(a)(1); (a)(2)(B); (a)(2)(C); (a)(4). After considering these factors, the Court can modify the conditions of supervised release; or, if the Court finds by a preponderance of the evidence that a defendant has violated one or more terms of supervised release, the Court may revoke supervised release and require the defendant to serve an additional period of imprisonment and supervised release. *Id.* §§ 3583(e)(2); (e)(3).

Under the Sentencing Guidelines, which provide nonbinding advisory policy statements regarding supervised release violations arising from federal convictions, Mr. Bernier's violations would be considered Grade B violations. *See* U.S.S.G. § 7B1.1(a)(3). The Guidelines recommend that, upon a finding of a Grade B violation, the Court shall revoke supervised release. *See* U.S.S.G.

§ 7B1.3(a)(1). Based on Mr. Bernier's criminal history category of I, the Sentencing Guidelines recommend a period of imprisonment of four to ten months if the Court revokes his supervision. *See* U.S.S.G. § 7B1.4(a). The maximum term of imprisonment upon revocation of supervised release for a defendant convicted of a Class D felony, such as Mr. Bernier's conviction under 18 U.S.C. § 1001, is 24 months. See 18 U.S.C. § 3583(e)(3).

## SUMMARY OF RULINGS ON VIOLATIONS

The Court finds that the Government has demonstrated by a preponderance of the evidence that the following violations support the revocation of Mr. Bernier's supervised release: No. 1 (possession of an unauthorized laptop); No. 2 (making untrue statements to the Probation Officer about the laptop, in connection with Violation No. 1 above); No. 3 (failure to provide verification of narrative therapy); No. 5 (possession of multiple unreported email accounts); No. 6 (unauthorized travel to New Hampshire); No. 7 (denying the alteration of a Computer and Internet Use Questionnaire, in connection with Violation No. 5 above); No. 9 (using an unapproved data storage device); No. 10 (accessing a website that was not reported to the Probation Office); No. 11 (accessing the Internet without authorization – filing a corporate annual report); No. 12 (accessing the Internet without authorization – sending the BOP email); No. 13 (unauthorized use of a computer at the Probation Office); and No. 14 (failure to truthfully answer questions about the computer usage at the Probation Office, in connection with Violation No. 13 above).

The Court finds further that while the following violations do not support the revocation of Mr. Bernier's supervised release, these violations may be used to support this Court's continued monitoring of Defendant's behavior, his use of technology and the Internet, and his financial trancations: No. 4 (unauthorized use of the computer with regard to emails to entities in Colorado

and Alabama); No. 8 (commission of a crime in Hollywood, Florida); as well as allegations underlying No. 3 (creation of medical documents) and No. 12 (creation of BOP letterhead).

DATED: August 23, 2018         _____/s/_____

                                           COLLEEN KOLLAR-KOTELLY
                                           UNITED STATES DISTRICT JUDGE